Before we came back into communication we had mentioned the possibility of having the defendants, the appellees, argue the case together because except for some uniqueness with Hunt's situation in the union, it's really the exact same argument and I don't know why I didn't catch it before. It shouldn't be listed as two separate cases. It should have been consolidated for purposes of the appeal. But I wanted to let you know that and see if you had any problem with it. I approve the consolidation. Okay. Thank you. For purposes of the argument, I'm going to take six minutes and reserve a total of three if we need it. Who's going to do the rebuttal? Who's going to give the rebuttal? Actually, I like it. You can decide that after you hear the argument. Right. May it please the court, my name is Mike Ziccolello. I represent Ralph Briggs in this First Amendment retaliation case. Interestingly enough, the case is really based on the issue of appeal causation, the question of causation. And just a couple of weeks ago on June 25, 2019, the Third Circuit issued a decision in Villaga v. Pittston Area School District, and they go through the test for causation, going through the well-accepted principle of unusually suggestive temporal proximity between protected activity and retaliation. Let's focus on the temporal proximity, because that seems to be problematic here. For some reason, which I don't quite understand, the district court took the time of the action and measured the key time from the time of the speech to the time of the dismissal, as opposed to the time that Drake was elected. Right. I think that it's important to look at the standard. And the standard is unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action. I understand that in this instance... That's a softball that just went right directly past you. Go ahead. Go ahead. I understand in this instance there was eight months between the election results and my client's termination. But the moment that the deputy sheriff who became elected sheriff... When he had the power to do something, right? Right. And I think you've got to look at the rule of common sense. That is unusually suggestive temporal proximity. Once he had the power to do it, he did it. I think that... What, nine days? Nine days. And I do think that that really should have ended the court's inquiry. But they went on and really didn't apply the other arguments that we were making, which is that there was a campaign of retaliatory harassment. Once my guy lost the primary election, a month later, because he was the most senior part-time officer with a good, clean record, he was promoted to full-time. And then this campaign of harassment started against him, where we recited in the record all the facts. He denies things occurred. We have other witnesses saying things didn't occur. The person who's always reporting him is this Kevin Hannan, who is described as friends of Drake, the guy who was elected sheriff. He's not a defendant. Where is he? He is not a defendant. He was a decision-maker. He continually reported my client for things. And actually, after my client was fired, Kevin Hannan leapfrogged two other part-time officers and given my client's full-time job. Well, there are questions as to whether these things were retaliatory or whether they were real, whether other people were flicking lights or doing other, whether he was sleeping or not sleeping. I mean, all these things are subject to looking one side or the other. But I assume your argument is that when the district court determined that the accretion of episodes of misconduct caused the defendant to decide it was in their best interest to end the employment relationship, your point is that's something for a jury to decide. Right. He evaluated and determined the misconduct. He disregarded all of our evidence and accepted everything the defendant said is true. I'd just like to add one thing. In the Beloga case, when they talked about evaluating the evidence and the burden shifting, they said you should just review, apply a standard of summary judgment to the employer's evidence to say that this is why we fired the person and evaluate the individual's evidence and the employer's evidence. We included in our brief, and the judge relied upon a case that talked about the standard being that you have to cast substantial doubt on a fair number of the reasons advanced by the employer. And after seeing Beloga didn't mention that, I look back and that comes from, it's cited in one Third Circuit case called Stevens v. Kerrigan, just on one line, but it cites it to Fuentes v. Persky, which is a Title VII burden shifting case. And it's in footnote seven. And when it talks about that, it says we're saying that this is the standard. You only have to cast doubt on a fair number of them because once you do a few of them, then it becomes a credibility issue as to whether, you know, we should believe the employer in any of the other ones. So, you know, I don't think that, I think the judge liked the phrase cast substantial doubt. But when you actually get into the case law, what it means, it's actually more favorable to the plaintiff that we're supposed to cast substantial doubt on just a few of these. And I think we have. And you don't even have to look at all of them. I really think we've cast substantial doubt on all the reasons that they gave for disciplining my client in the past. So we do feel that the judge overly reliant on this concept of cast substantial doubt was improper. On top of that, it is, it seems as if it's, it gets in the area of weighing evidence, which is for juries, whether the judge is going to say whether something cast doubt. In his opinion, the judge said my burden was to cast substantial doubt. And that I didn't cast any doubt. I don't know how you look at the record and determine I've not casted any doubt with respect to my client denying incidents occurred, other people having contradictory statements about what occurred. So we do think the evidence on a whole does show that we casted enough doubt. And there's an issue of fact for jury determined as to whether the employer's reasons for terminating my client were the real reasons or whether it was really the basis of retaliating against him for having filed a first file, pursued the sheriff's position. And I think what I haven't mentioned that was obvious here, the only other person in the sheriff's department in the corrections department who ran for sheriff as well was fired shortly after my client. My client's fired nine days and I think he was maybe 15 days later. Weeks later. And so the only two people in the sheriff's, in the sheriff's department corrections who ran for sheriff were fired. And they both had clean records before they ever ran for sheriff. Thank you. Please support. I'm Joshua Cochran. I'm here on behalf of Roy Hunt. I am primarily going to talk about the union association issue, which, you know, to me, it comes out with plain error in really two areas. One, the court construed the union, a pure union association claim, which I believe is controlled by Polardi from last year as well as reinforced by Belaga this year. In fact, last month, as a kind of a hybrid or a pure free speech or union speech claim. It's an association claim. Right. It is an association claim. And it is pure. And from the start, you know, we haven't been arguing that the retaliation is on the basis of any of the content of the collective bargaining that he was doing. Any of the necessarily the grievances that he was raising. It's just that he was acting as an active union steward. And that's what Roy Hunt was. His union role was crucial to his identity. And he took it seriously. He pressed these grievances on behalf of the union. He drew the ire. He drew the ire of county commissioners as well as the new sheriff. And when the new sheriff and warden took over, there was a willing participant to get him fired. And he was fired in really short order. I believe. He was fired specifically having to do with his wanting evidence relating to the grievance regarding Briggs. Yes. Yes. And that was that occurred in connection with his investigation of Briggs grievance. And to kind of backtrack a little bit, Briggs was on probation because of an alleged sleeping incident, which was, you know, had doubt cast on it, as we discussed earlier. And then when they terminated him and the union grieved it, that issue came back into the case. And so Roy became aware, it was actually on his shift, that the head officer, the officer in charge, as well as the other CO were sleeping on the job. He believed he could get this evidence from the county commissioner who was in charge of the computer personnel. He approached her. It was just the act of approaching her that triggered her. She says at that particular meeting, Roy, you've got to stop this. If you live by the sword, you're going to die by the sword. And then she ultimately did not give him the tape. She called the sheriff. She sent the sheriff a letter. The sheriff describes the letter as about the meeting on the 18th for the... But the objection was chain of command that you don't go to her, you go somewhere else. And he violated the chain of command. Yes, and there is no chain of command to investigate grievances. A number of the defendants, quite frankly, agreed to that. I had placed that in my statement of facts in my brief in the trial court. Well, chain of command to violate grievances or chain of command to get the video? The chain of command to investigate grievances. I thought the problem was the chain of command just to ask for the video. That he asked for a keep off, I guess the name is, or a move over? That's what the defendants say. The defendants, to the extent that I understand what they're saying, they're saying he wasn't there investigating a grievance. He was there trying to rat out his fellow officers. And there's nothing in the record that supports that because even the letter back from the commissioner indicated that he was there in conjunction with a March 8, 2016 grievance hearing, which was Ralph Briggs. It wasn't specifically listed as Ralph Briggs, but it clearly unambiguously is. I mean, when I sat down to look at this, I thought count two was so clear, I considered a motion for summary judgment on my own. Ultimately, I didn't do that because I believe there are enough contested facts that I don't think it would have gone anywhere. But my quarrel, I guess, with the district court is construing the claim as a free speech claim and requiring public concern when it's clearly throughout, from complaint up through the briefing, we never argued the content. It's strictly actions that he took, Roy took on behalf of the union. And I believe under Belaga and Polardi that the court had to look at that separately. There's no public concern requirement because public concern effectively is satisfied as a matter of law. And then the other quarrel that I have with the district court is he looked beyond the evidence of causation that I have on this point. I have direct evidence of anti-union animus, which is the statement from Susan Keefe over the commissioner, love by the sword, you die by the sword. Well, that's ambiguous. Drake's comment, it seems to me, is more helpful to you, that he hasn't boasting about not having any grievances since he got rid of Hunt. Right. And I agree with that, but I would point out as far as I will concede the ambiguity, but we would get the inference at summary judgment. So we have direct evidence of that. We also have Keefe over later saying, and this was at a deposition, she indicated that, yes, she did have an issue with Roy. It was Roy using his position as a union steward to file grievances, which in her opinion upset good governance at the jail. So that's our direct evidence. But we also have timing in the context of these grievances that are going through the process when he's actually fired. They weren't resolved. He is collective. He's participating on the union collective bargaining agreement for the next agreement. At the same time, this is all going on. So he is being an active thorn in their side when they terminate him. So I believe we have, we can't have clearer temporal proximity in that respect. And we also have the temporal proximity as well as the pattern of antagonism because part of what, before they fired him, they wrote him up for a couple of cell phone violations. And the cell phone violations, the cell phone policy required when you were on duty, the cell phone was in the break room. They wrote him up when the cell phone was in the break room. And the person who wrote him up was Deputy Warden Keefe over. And at her deposition, she agreed at all times the cell phone was in the break room. So they were writing him up for additional unfounded disciplinary measures. So, you know, under those facts, I mean, I believe that the court committed clear error and should not have granted summary judgment on count one. And with respect to the other claims, I would largely rely on what Michael argued. I believe the issues of causation are pretty similar on slightly different time frames. But, you know, ultimately the two guys who ran against him for sheriff were fired. So I thank you. Judge Ross, any questions? No. Okay, thank you. Ms. Reed. May it please the court, my name is Robin Reed. I'm here on behalf of all of the appellees today. And I understand the court's concerns. I think some of the facts are a little bit skewed here. But with regard to the Union Association claim, I think that this is a case that Mr. Hunt had actually settled his case. He filed it under a grievance. And he settled the case short of a binding arbitration. And so I think that he is not even permitted to argue that case in this court today. I have no idea what you're talking about. I'm sorry? He's not arguing the case. He's arguing that his involvement with the Union in presenting that case is what caused him to get fired. It's not a retaliation claim. Well, no, I understand that. But he actually, in his grievance, in his union's grievance for his termination, he actually included the fact that he was terminated because of his union association. Under the contract, sections 10 and 38, there's anti-discrimination provision in there with regard to any kind of union activity. And so when he filed his grievance, he actually included that in his grievance and went to the second stage. The second stage was affirmed. And then short of the petition for binding arbitration, and he settled his claim. And so I think that that claim, based on any kind of union activity, he's given up. It's not even part of this case. It should be part of this case. Was that argued to the district court? It was, Your Honor. It was, and it's in my brief. And the fact that he actually received the benefit of the bargain. He was given $3,700 for premiums for his health insurance. His status was changed from terminated to resigned. And the county, he had filed for Pennsylvania Unemployment Compensation. Are you saying that the terms of his settlement agreement said he gave a complete release and can't proceed? I think on that issue, Your Honor. Maybe not on the free speech issue, but I think that with regard to the union, this union association claim, yes. Because he did file that grievance. Where is that in the appendix? Where is that in the appendix? The settlement agreement that would include his release of claim. The settlement agreement is... I mean, you can give it to us afterwards. Yeah, I apologize. I don't have that as far as the specific page. But the settlement agreement is in the appendix. And I did reference it in my brief. And I think that the same argument goes with regard to Mr. Briggs with regard to his claim for free speech. Because not only did he include that in his grievance when he filed his grievance under the contract. And so, you know, the question... Did you cross-appeal the district court's ruling on that regard? I did, Your Honor. Pardon? I did. I did, Your Honor. Let's talk about the temporal proximity. What's wrong with the appellant's argument that really we need to look at when did Drake get the power, the ability to fire these people? Well, I think that with regard to the Briggs case, we've got an additional defendant in that case, and that is Ken Solley, who was the sheriff at the time. And Ken Solley had the authority at all times to fire Mr. Briggs. But he didn't do it. He didn't do it. He didn't do it. And the other thing I'd like to point out to the court is they are talking about... My opponents are talking about Mr. Hannon, the correctional officers that are writing up these... I can't even remember what they're called. Yeah, the actions against Mr. Briggs. They're not part of this case. There's no conspiracy charges, nothing. So Ken Solley, who was the sheriff at the time, he actually was acting on behalf of these claims by the other officers, and he was making determinations. Mr. Briggs never grieved any of the allegations against him up until the time he was terminated. So there were three separate incidences in 2015, one in August, one in September, and then in October he was actually terminated on October 14th by Ken Solley and then returned. He was sleeping on the job. And that's when he was placed on the 90-day suspension, and he was given a two-day suspension, and he was on the 90-day probationary discipline. And at that time he did not grieve that. Mr. Briggs did not grieve either the penalty nor the discipline at that time. So he was placed on the 90-day disciplinary. There were two separate incidents at the end of December prior to Sheriff Solley actually retiring, and then when Mr. Drake actually was sworn in on January 4th, and then it was his problem basically. Are you saying he had to grieve under the collective bargaining agreement? I do. I'm saying that I think that there are some things that arise out of the contract. And in this case I think that Mr. Hunt's issue with regard to his discrimination based on his union association claim I think was derived from the contract and based on the fact that there's two separate provisions in the contract. In addition to that, the best evidence that these issues are derived from the contract is both of these individuals included them in their grievances. Mr. Briggs said he was terminated in retaliation for his campaign, and Mr. Hunt said he was terminated. But they're not pursuing a contract claim here. They're pursuing a constitutional claim. I know, but they originally started out with this as a contract claim. What's your best case? I think that just the fact that the individuals that there's a whole. No, I mean what opinion gives you. I don't have anything to cite too specific. There's a whole area of law in the federal labor statute. I can't read a whole area of the law. Oh, I understand that. I understand that. And I apologize, Your Honor, but I think that the whole area of labor law is designed to resolve disputes through the grievance process. And these individuals. You're talking about conditions of employment. Problems that arise within the context of employment that go to conditions of employment, terms of employment. Correct. I'm not talking about a constitutional violation. Why not? It's a matter of how you phrase this, though. It does matter how you frame it. You framed it as a constitutional violation. Yes. And I think that this is what they've alleged. But if you look at the context and the form, Mr. Briggs obviously had several disciplinary actions prior to this time, and then there were two additional ones. He was on the probationary status, and that he actually included the concept that he was terminated for this campaign. If through the grievance process he was determined to have been terminated for just cause, then he couldn't have been terminated for retaliation. And I think that's the best when you talk about what's the case. There's not a specific case because I haven't found any cases that are specifically, you know, have a similar fact pattern. Well, it's a pretty familiar fact pattern. Something happens, it's either a violation of collective bargaining agreement and they grieve it, or they say, wait a minute, my constitutional rights have been violated, and you're saying if he wants to say the latter, he can't do it if he didn't grieve it. And I don't know of a case that says that. Well, I'm not so sure that that's exactly my argument. I think the issue here is that he did in fact, when you talk about whether this is actually these issues are derived from the contract, the best evidence is they grieved him under the contract. And so I think that that is, you know, when you talk about whether their claims actually arise out of the contract, they made that determination. And another argument, another facet of this is the causation issue. Yes. And the district court characterized it as an accretion of episodes of misconduct that gave the defendants the basis to fire them. There's a lot of conflicting, I mean, the evidence, the appendix here is huge and every other page is this is right, no, this is, you know, everybody's disputing the facts. Why isn't this a perfect case to go to trial? Because we don't know who, we don't know, do we know that it was an accretion of episodes of misconduct, or there was no misconduct at all? Well, I think with regard to Mr. Briggs especially, there were three incidences in 2015 where he was disciplined and that discipline for violations of jail policy, that discipline was never grieved. They had 15 days in the contract to grieve. If you don't grieve it, then you basically lose the right. You didn't lose the right, but it doesn't say something happened that was necessarily, you know, that you were necessarily in the wrong. Maybe you chose not to grieve it. Well, I think under labor law that's not actually correct. I think if you say if they don't grieve it, then they actually agree with the, if they don't, if they don't grieve the underlying determination that there was a violation and they don't grieve the discipline, then they've agreed to both of those. And so that's why in this situation, they're saying that Mr. Briggs was, after he was determined to be full time, that then all of a sudden these cases, all these correctional officers started writing incident reports on him. But that's not what the district court said. The district court didn't say he didn't grieve it, therefore he grieved it. He said there was an accretion of episodes of misconduct. And their very argument is it really wasn't misconduct because, you know, everybody else was doing it. And we have case law that says that that's relevant. And they're blowing it out of proportion. And it wasn't really bad. Why shouldn't a jury hear this? Well, again, I guess I'm coming from a different perspective. I think that in this case that Mr. Briggs did agree with those things because he didn't grieve them. That's not the district court didn't say Mr. Briggs agreed and so therefore. Well, when you talk about the accretion of incidents, I think that's when you go back to the fact that he hadn't grieved those and therefore that he didn't disagree with them. And the fact that they didn't. The other issue here is, and I just want to get to this because I know I'm running out of time here, but I think that there's a lot of factual issues here. I understand that's why you're going, you're saying maybe this is not a case for someone to judge on. But, and if you look at the, you know, terminated soon after the sheriff was sworn in. And those two individuals were actually, you know, ran against him. But if you look at the actual facts of the case, you look at the content of the case and the context. There aren't any facts here. Well, there are facts in the case. The facts that the. We know for facts that we have to assume is what they've alleged. But you can, if you look at just their own testimony, if you look at the testimony of Mr. Briggs, the fact that he recognized that he did not grieve those incidents. And therefore he lost the right to do so. Right. But that's, I mean, it all goes back to the contract and the fact that he chose to pursue his claim under the saying he waived the other thing. He waived it. He's saying that he, by not grieving it, he is agreeing to the fact of those reprimands or those violations of underlying conduct because he didn't leave it. Therefore, he admits that's what you're saying. That's basically, even though for us, he's saying some of this stuff never happened. Stuff that may have happened, like laying down on the flicking lights. Everybody does that. And the testimony from one of the persons would substantiate that. She said it never really works. So that would suggest that everybody does flick the lights. But he got some love for it. Well, it goes back to the. I don't want to get into the facts with you about the case. We have to get into the facts. At least the allegations are no facts. But the allegations are, you know, that he was flickering these lights. And if you look at that, it may be flicking a light on an inmate. Because their attention might be appropriate. But not a suicidal inmate that's in a holding cell. And they're watching him to make sure he doesn't commit suicide. And he's acting out. So that, I mean, it goes into the context. And that's what you told the jury? And that would, the jury could accept that? Or they could say no? They're trying to use that as an excuse now. But we believe that was a write-up because they wanted to get back at the guy. That's a jury argument. So I think that, you know, if you go back to the context of the individual situations here, that there is no, if you go back and look and see what the speech claim, is there's really no public concern here. I mean, the associational activity is independent. You don't need public concern. This is not just a First Amendment speech claim. I understand that. We've said so, you know, as recently as the Bologna case. We've reinforced that. Yeah, I understand that. But I think that, I'm going back to the speech case. Because I think that the union case, again, I think that he's weighed in. I understand you don't agree with me on that necessarily. But the speech case has to do with what happened during the campaign. Yes. And that definitely, that's political speech. That's definitely a matter of public concern. There can be no argument. But if you look at the specifics, I mean they're talking about what they would do to change the, these candidates are talking about what they would do to change the sheriff's office. Exactly. And that's really a matter of public concern. But he wasn't even the sheriff at the time. I mean, he was not the sheriff at the time. Still a matter of public concern. When you're campaigning, you talk about what you're going to do. Whether you do it is another question. Well, I understand that. And he was part of the administration. Drake was right there under Sawley. So he was part and parcel of the hierarchy. Right. But I don't, but it's all part of the, the campaign is not necessarily, the speech that was during the campaign was not necessarily for the benefit of the public. It was personal. It was personal animus, basically. Well, anything said in a campaign where there are other people is going to be personal to the other people because you're criticized. But it's all a matter of public concern, isn't it? Right. And that's what people do. That's why people watch the debates and everything else because they're concerned about their government. But doesn't it, it goes to the extent of what you're going to say, whether you're disclosing the fact that they have been, you know, stealing money from somebody is one thing. But if you're saying that they, you know, I don't think that their hours and part of this is part of the, they're going to go from 12 hours or eight hours to 12 hours a day. You know, I'm going to do 12 hours a day. I'm going to implement 12 hours a day when I become sheriff because I don't think that we should do it. We should have as much overtime as we have. But that's a matter of public concern. That's really public concern. That's policy. Tax dollars. Absolutely. Well, I think that I guess you're going in the direction that this should be remanded for trial. And do you have any questions that I can answer? Obviously, I think I've exhausted. Nothing. Thank you. I think both sides for. Just very, very brief. Oh, please. Did you hear our exchange with your friend? I was doing this. What do you want to say to us? I just want to say that the release is in the appendix. I don't know where it is. Read it. It's limited by its terms to the resolution of that grievance. And it's not to be introduced. Okay. Thank you very much. Thank you. Thank you.